**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

BRIAN W. SCHRADER,

        **Plaintiff,**

v.

                                                  **Case No. 19-2387-DDC-TJJ**

EMPORIA STATE UNIVERSITY,
RAY LAUBER, DAVID CORDLE,
LISA MORITZ, MAX McCOY,
and ALLISON GARRETT,

        **Defendants.**

---

**<u>MEMORANDUM AND ORDER</u>**

This action is the latest entry in a developing genre of cases where a male respondent accused of sexual harassment in a university Title IX proceeding later files a lawsuit for alleged sex discrimination and gender bias in the proceedings against him. The usual case is a male college student suing his former university for expelling him. But this isn't the usual case.

Plaintiff Brian W. Schrader was a professor of psychology at defendant Emporia State University (ESU) for more than 20 years. In 2017, a student in one of his classes filed a sexual harassment complaint against him, triggering a Title IX investigation and, eventually, termination proceedings. After hearing all the evidence from ESU and plaintiff in the Title IX proceeding, a committee of tenured faculty decided that ESU shouldn't terminate plaintiff. But ESU sanctioned him anyway, limiting his ability to interact with students and placing an automatic suspension on his employment should another student file a harassment complaint. And amidst a campus furor about plaintiff remaining an ESU professor—including several public statements from ESU President Allison Garrett about the investigation and the larger

culture of sexual harassment on college campuses—that is exactly what happened:  another student filed another harassment complaint and ESU immediately placed plaintiff on administrative leave.  He eventually resigned while the investigation was pending.

Plaintiff brings this lawsuit alleging several claims against ESU, Garrett, and several of ESU's current and former employees involved in the Title IX investigation.  He brings claims against ESU for discrimination and a hostile work environment under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2, for discrimination and retaliation under Title IX of the Educational Amendments Act of 1972, 20 U.S.C. § 1681(a), and for violations of Kansas state law.  He also brings claims under 42 U.S.C. § 1983 against Garrett and several other ESU administrators and employees in their individual capacities for alleged procedural due process violations and for impugning his reputation (*i.e.* a "stigma-plus" liberty interest claim).

Before the court are each defendant's individual Motion to Dismiss under Fed. R. Civ. P. 12(b)(6) (Docs. 89, 91, 93, 95, 97, 99) and supporting briefs (Docs. 90, 92, 94, 96, 98, 100). Plaintiff has filed responses to each motion (Docs. 108, 109, 110, 111, 112, 113).  And all the defendants, except ESU, have filed replies (Docs. 120, 121, 122, 123, 124).  Also before the court is plaintiff's Motion to Certify Questions of Law to the Kansas Supreme Court (Doc. 125).  As explained below, the court denies plaintiff's motion, grants the individual employees' Motions to Dismiss and thus dismisses them from this suit, and finally, grants in part and denies in part defendant ESU's Motion to Dismiss.  So, this case will proceed on the surviving claims.

## I.    Factual Background

The following facts are taken from the allegations in plaintiff's Third Amended Complaint (Doc. 83) and viewed in the light most favorable to him.  *SEC v. Shields*, 744 F.3d 633, 640 (10th Cir. 2014) ("We accept as true all well-pleaded factual allegations in the

complaint and view them in the light most favorable to the [plaintiff]." (citation and internal quotations omitted)); *see also Cid v. Bd. of Cnty. Comm'rs*, No. 18-4012-DDC-KGS, 2019 WL 161495, at *5 (D. Kan. Jan. 9, 2019) ("When considering a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the court must assume that the factual allegations in the complaint are true." (citations omitted)).

Plaintiff started working at ESU in 1996 in the psychology department and eventually became a tenured professor.  Doc. 83 at 3 (Third Am. Compl. ¶¶ 14–15).  In his 21 years at ESU, he had an unblemished disciplinary record.  *Id.* (Third Am. Compl. ¶ 16).

In the spring 2017 semester, "J.J." was a student in one of plaintiff's classes.  *Id.* (Third Am. Compl. ¶ 17).  Toward the end of the semester, plaintiff met with J.J. to talk about her poor performance on an exam.  *Id.* (Third Am. Compl. ¶¶ 19–20).  The meeting was unremarkable, but later that day, plaintiff asked J.J. to meet with him again because he discovered that J.J. had cheated on a homework assignment, which was academic misconduct.  *Id.* (Third Am. Compl. ¶ 20).  This was not the first time J.J. had cheated on an assignment, so she faced possible expulsion from ESU.  *Id.* (Third Am. Compl. ¶ 21).  When plaintiff met with J.J. the second time, she didn't deny plaintiff's allegation of cheating and began to cry.  *Id.* at 4 (Third Am. Compl. ¶¶ 22–24).  Plaintiff then handed J.J. a tissue, when their "fingers briefly and lightly touched."  *Id.* (Third Am. Compl. ¶ 25).  According to plaintiff, J.J.'s demeanor changed abruptly when she learned of the potential consequences of her academic misconduct and then left the meeting clearly upset.  *Id.* (Third Am. Compl. ¶ 26).

The next day, J.J., who is from South Korea, spoke with the Office of International Education about her meeting with plaintiff.  *Id.* (Third Am. Compl. ¶ 27).  A week later, she filed a formal sexual harassment complaint against plaintiff.  *Id.* (Third Am. Compl. ¶ 28).

Both plaintiff and J.J. signed non-retaliation and confidentiality agreements about the complaint. *Id.* (Third Am. Compl. ¶¶ 29–31).

That summer, defendant Lisa Moritz, ESU's Title IX investigator at the time, then investigated and prepared a report about J.J.'s complaint. *Id.* at 5 (Third Am. Compl. ¶¶ 32–33). Plaintiff alleges that Moritz's report was "filled with at least twenty inaccuracies, inconsistencies and omissions and included Moritz'[s] own theories that are unsupported by facts or reasonable inferences about what occurred." *Id.* (Third Am. Compl. ¶ 34). As examples, plaintiff alleges that "Moritz did not interview J.J.'s boyfriend even though J.J. met with him after meeting with [plaintiff]." *Id.* (Third Am. Compl. ¶ 35). Nor did Moritz prepare a timeline of events and actions, which, plaintiff claims, "would have shown it to have been very unlikely if not impossible for [him] to have committed any act of sexual harassment given that he was scheduled to make a presentation to a group across campus less than fifteen minutes before the end of his meeting with J.J." *Id.* (Third Am. Compl. ¶ 36). And rather than use a disinterested interpreter for her interview with J.J., who was not fluent in English, Moritz relied instead on J.J.'s roommate to translate. *Id.* (Third Am. Compl. ¶ 37). Moritz's report conceded that this was "not standard practice." *Id.* at 6 (Third Am. Compl. ¶ 46).

Moritz's report included her credibility determinations of plaintiff and J.J.: she described J.J. as "honest and genuine," but described plaintiff as "somewhat cautious and restrained," "overly tidy," and "lacking the specific detail and emotion" she expected. *Id.* at 7 (Third Am. Compl. ¶¶ 48–49). The report also recounted a campus police officer's impression of plaintiff as having a "creepy aura about him" without further explanation. *Id.* at 6 (Third Am. Compl. ¶ 41). Moritz's report concluded that plaintiff had proposed a "quid pro quo" to J.J., where he would not report J.J.'s conduct in exchange for a sexual favor. *Id.* (Third Am.

Compl. ¶ 44).  From this, Moritz's report concluded that it was more likely than not that plaintiff violated ESU's policy on sexual harassment.  *Id.* at 7 (Third Am. Compl. ¶ 50).

Moritz then submitted her report to defendant Ray Lauber, ESU's Human Resources Director.  *Id.* at 5 (Third Am. Compl. ¶ 32–33).  Lauber evaluated Moritz's report under a "preponderance of the evidence" standard, following a 2011 "Dear Colleague Letter" from the U.S. Department of Education, Office of Civil Rights.  *Id.* at 7 (Third Am. Compl. ¶ 54).  Under that standard, Lauber concluded plaintiff had committed sexual harassment toward J.J.  *Id.* at 8 (Third Am. Compl. ¶ 56).  He then submitted that conclusion and a summary of Moritz's report to defendant David Cordle, ESU's Provost.  *Id.* at 7–8 (Third Am. Compl. ¶¶ 51–52, 61). Although the Department of Education later withdrew the 2011 "Dear Colleague Letter" and replaced it with a different letter recommending a "clear and convincing evidence standard," in the fall of 2017, neither Lauber nor any other administrator amended the report's conclusion that plaintiff had violated the university's harassment policy under the preponderance of the evidence standard.  *Id.* at 8 (Third Am. Compl. ¶¶ 57–58).

In late 2017, Cordle commenced formal termination procedures against plaintiff.  *Id.* at 8 (Third Am. Compl. ¶ 61).  After hearing evidence from ESU and plaintiff, both of whom were represented by counsel in a closed hearing, a committee of tenured faculty at ESU determined unanimously—under a clear and convincing evidence standard—that plaintiff did not commit sexual harassment towards J.J. and that ESU shouldn't terminate his employment.  *Id.* at 8–9 (Third Am. Compl. ¶ 63); Doc. 100-1 at 11–12 (Ex. E).[1]  But on December 6, 2017, defendant

---

[1] The court may consider this document and others submitted by defendant ESU without converting its Rule 12(b)(6) motion into a motion for summary judgment.  If "the document is referred to in the complaint and is central to the plaintiff's claim, a defendant may submit an indisputably authentic copy to the court to be considered on a motion to dismiss." *GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir. 1997).  Plaintiff acknowledges that ESU has attached several documents that plaintiff refers to in his Complaint, and he doesn't contest the court's

Allison Garrett, the president of ESU, imposed sanctions against plaintiff.  *Id.* at 3–6 (Ex. B).

In a letter to plaintiff, Garrett explained:

> In a situation such as this where there are no direct witnesses and where both Complainant and Respondent have given compelling interviews regarding what occurred, I find that although the Complainant's case has not been proven by clear and convicting evidence, the report does justify certain precautionary measures.

*Id.* at 5.

First among these measures, Garrett told plaintiff that "[s]hould another colorable claim of sexual harassment or breach of academic integrity arise at any point in the future, [he] w[ould] be suspended immediately during the pendency of the investigation and hearing." *Id.* ESU further "reserve[d] the right to re-open [the J.J.] matter should other evidence be brought to light or similar allegations be made against [plaintiff] by others." *Id.*

Next, Garrett told plaintiff that ESU would restrict his interactions with students on campus, prohibiting him from meeting with them behind a closed door without their permission, or meeting or otherwise communicating with them off-campus.  *Id.* at 5–6.[2]

---

consideration of these documents, "except to the extent that they contain statements of fact from any University employee or officer."  Doc. 113 at 3.  The court considers these documents only to understand fully ESU's actions against plaintiff.  And it may do so because plaintiff references the documents in his Complaint, they are central to his claims, and plaintiff doesn't dispute their authenticity.

[2] Specifically, ESU prohibited plaintiff from:

    a.  meeting with any individual student in any location other than a public space such as a hallway or student lounge or in [plaintiff's] office during normal business hours;

    b.  meeting with any individual student behind [plaintiff's] closed office door unless the student requests that that door be closed or there is another person present;

    c.  covering or otherwise obstructing the window to [plaintiff's] office;

    d.  socializing with any student or students, except in a group setting with one or more additional faculty or staff members present;

    e.  communicating with any individual student other than in person, via written comments on graded exams or assignments, through [plaintiff's] university-email account, or through the ESU's course management system; or

    f.  meeting with or communicating with either of [REDECATED] or [REDACTED] discussing them with colleagues or with other students.

In the following months, in February and March of 2018, ESU's student newspaper, *The Bulletin* published several stories about J.J., or "Jane."  Doc. 83 at 9 (Third Am. Compl. ¶ 66).  As alleged by plaintiff, *The Bulletin* first published an article headlined "Cryptic Letter Provides Heat But No Light," about a letter Garrett sent to the Faculty Senate about an unnamed faculty member.  *Id.* (Third Am. Compl. ¶ 67).  *The Bulletin* then published two articles a week later about J.J.'s harassment complaint and the resulting investigation against plaintiff.  *Id.* (Third Am. Compl. ¶ 68).  The first, titled "Abused?  Don't Talk About It," noted that J.J. faced disciplinary action in speaking about her case and so didn't name her in the story.  *Id.* (Third Am. Compl. ¶ 69).  But the story did name plaintiff.  *Id.*  The second story, titled "Misconduct Investigation Leaves Student 'Hopeless,'" reported that J.J. had given *The Bulletin* more than 150 pages of correspondence with university officials about the investigation, and chose to break her confidentiality agreement with the university despite possible retaliation.  *Id.* at 10 (Third Am. Compl. ¶ 70).  The story identified plaintiff as the subject of J.J.'s complaint, provided J.J.'s account of the complaint, and quoted her as saying "[plaintiff] may have done the same thing to other students that he did to me."  *Id.*

Controversy then erupted on ESU's campus.  *Id.* at 10–11 (Third Am. Compl. ¶¶ 73–74).  Eventually, ESU scheduled a town hall to hear from the students.  *Id.* at 11 (Third Am. Compl. ¶ 75).  As alleged by plaintiff, *The Bulletin* reported on March 1, 2018 that several students at the town hall demanded that ESU fire plaintiff.  *Id.*  The story quoted one student as asking if ESU was "still employing a sexual predator" on campus.  *Id.*  Plaintiff also alleges that defendant Garrett asked individuals to come forward with complaints against plaintiff at the town hall.  *Id.* at 13 (Third Am. Compl. ¶ 84).

---

Doc. 100-1 at 5–6 (Ex. B).  Garrett then required plaintiff to certify in writing to the Provost every semester that he had not engaged in any of the prohibited conduct.  *Id.* at 6.

In another story on March 1, *The Bulletin* included an interview with defendant Garrett, who said she supported the #MeToo movement and said any woman of a certain age, including herself, "would be able to point to certain things that have happened to them that fall in that category." *Id.* at 11 (Third Am. Compl. ¶ 76). On March 15, *The Bulletin* reported that ESU removed plaintiff from advising undergraduate psychology students. *Id.* (Third Am. Compl. ¶ 77). The same story quoted defendant Garrett as saying that although she agreed with the faculty committee's decision that there wasn't clear and convincing evidence that plaintiff violated the sexual harassment policy, she didn't "know how people would have come out on the preponderance of evidence if that had been the standard applied here, given the additional information that was available." *Id.* But Garrett reiterated that the faculty committee "found unanimously that the university failed to meet its burden to prove that [plaintiff] engaged in these actions[.]" *Id.* at 11–12 (Third Am. Compl. ¶ 77).

While all this was happening, plaintiff e-mailed Garrett for help. *Id.* at 10 (Third Am. Compl. ¶ 71). ESU's assistant marketing and media relations director then met with plaintiff and told him he was free to defend himself in the press and could tell his side of the story. *Id.* (Third Am. Compl. ¶ 72).

On March 28, 2018, a second student filed a sexual harassment complaint against plaintiff and ESU thus placed him on administrative leave immediately. *Id.* at 13 (Third Am. Compl. ¶¶ 83–89). Plaintiff learned about this from letters hand delivered by Cordle and Lauber. *Id.* (Third Am. Compl. ¶ 85). Although it was paid leave, ESU prevented plaintiff from teaching summer classes, which had been his practice, and prohibited him from campus or from having any contact with students or faculty at ESU aside from his Department Chair. *Id.* at 14 (Third Am. Compl. ¶¶ 90–91). The same day, a *Bulletin* headline read, "Professor at

Center of Sexual Assault Controversy Placed on Administrative Leave[.]" *Id.* at 12 (Third Am. Compl. ¶ 80).  The story included a letter from Garrett to the university where she explained that she was "stepping outside of [ESU's] standard protocols to share this limited information" about plaintiff's administrative leave because "there was significant community interest in this matter[.]" *Id.*  Another story headlined "Professor Who Likely Tried to Kiss Student Placed on Leave, New Investigation Announced," quoted J.J. as saying "The administration has never contacted me.  It's nice that he's leaving school after this, but I still hate him." *Id.* (Third Am. Compl. ¶ 81).  Shortly after ESU suspended plaintiff, *The Bulletin* reported that Garrett said plaintiff could resolve the whole situation by resigning.  *Id.* at 14 (Third Am. Compl. ¶ 94). Plaintiff filed a retaliation complaint with ESU against J.J. and against defendants Garrett, Cordle, and Lauber in May of 2018.  *Id.* (Third Am. Compl. ¶ 95).

Throughout the spring 2018 semester, both before and after plaintiff's suspension, plaintiff unsuccessfully sought employment at other universities.  *Id.* at 15 (Third Am. Compl. ¶ 101).  In February, one university rescinded an invitation for plaintiff to visit its campus after learning "that a university investigation of a student complaint found a 'preponderance of evidence' that [plaintiff] w[as] in violation of university Title IX policies." *Id.* (Third Am. Compl. ¶ 102).  Another university declined an in-person interview with plaintiff in May after contacting defendant Cordle, even though the Department Chair at that university told plaintiff "[t]he search committee felt a connection with [him]" after a phone interview.  *Id.* (Third Am. Compl. ¶ 103).  Yet another university chose not to hire plaintiff in July after conducting a reference check after a phone interview.  *Id.* at 16 (Third Am. Compl. ¶ 104).  Plaintiff then applied to become a manager at Walmart.  *Id.* (Third Am. Compl. ¶ 105).  But he wasn't hired after he told a Walmart representative about what had happened at ESU.  *Id.*

Plaintiff resigned as a professor at ESU on December 11, 2018, a little over eight months after ESU suspended him for the second harassment complaint.  *Id.* at 14 (Third Am. Compl. ¶ 98).  The week after plaintiff resigned, ESU concluded that he had violated university policy on sexual harassment and romantic or sexual relationships between students and faculty. Doc. 100-1 at 7 (Ex. C).  Although plaintiff had resigned, Cordle told him in a letter that he was ineligible for future employment with ESU and was banned from campus.  *Id.* at 7–8.

Plaintiff filed two charges of discrimination against ESU with the U.S. Equal Employment Opportunity Commission (EEOC) on January 17, 2019 and April 18, 2019.  Doc. 83 at 2 (Third Am. Compl. ¶¶ 10–11).  The EEOC issued a "Dismissal and Notice of Rights" to plaintiff for both charges on June 18, 2019.  *Id.* (Third Am. Compl. ¶ 12).  And the Kansas Human Rights Commission told plaintiff on July 3, 2019 that he had exhausted his administrative remedies with that agency.  *Id.* at 2–3 (Third Am. Compl. ¶ 13).  Plaintiff timely filed his Complaint with our court, and after several amendments and mooted motions to dismiss filed by the defendants, the court arrives at plaintiff's Third Amended Complaint and each defendant's Motion to Dismiss.

## II.    Legal Standard

Fed. R. Civ. P. 8(a)(2) provides that a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Although this Rule "does not require 'detailed factual allegations,'" it demands more than a "pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action,'" which, the Supreme Court has explained, "'will not do.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

10

When considering a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the court must assume that the complaint's factual allegations are true. *Id.* (citing *Twombly*, 550 U.S. at 555). But the court is "'not bound to accept as true a legal conclusion couched as a factual allegation.'" *Id.* (quoting *Twombly*, 550 U.S. at 555). "'Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice'" to state a claim for relief. *Bixler v. Foster*, 596 F.3d 751, 756 (10th Cir. 2010) (quoting *Iqbal*, 556 U.S. at 678). The complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level[.]" *Twombly*, 550 U.S. at 555 (citations omitted).

To survive a motion to dismiss under Rule 12(b)(6), a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556); *see also Christy Sports, LLC v. Deer Valley Resort Co.*, 555 F.3d 1188, 1192 (10th Cir. 2009) ("The question is whether, if the allegations are true, it is plausible and not merely possible that the plaintiff is entitled to relief under the relevant law." (citation omitted)).

## III.   Analysis

Plaintiff brings eight claims—six under federal law and two under Kansas law—against six defendants. He sues defendants David Cordle, Allison Garrett, Ray Lauber, Max McCoy, and Lisa Moritz in their individual capacities under 42 U.S.C. § 1983, alleging procedural due process violations. Specifically, he claims all five individuals violated his Fourteenth

Amendment due process rights by making false and defamatory statements about him that foreclosed any hopes of future employment (Count VIII). He also claims that Cordle and Garrett further violated his Fourteenth Amendment[3] due process rights by failing to follow certain procedures during the investigation of J.J.'s complaint (Count VII). But plaintiff makes his principal allegations against his former employer, Emporia State University (ESU). Against ESU, plaintiff asserts claims under Title VII for reverse sex discrimination and hostile work environment (Counts I and IV) and claims under Title IX for reverse sex discrimination and retaliation (Counts II and V). He also brings two Kansas law claims against ESU for Tortious Interference with Prospective Contractual Relationship or Expectancy (Count IX) and Blacklisting under Kan. Stat. Ann. § 44-119 (Count X).[4]

Each defendant has filed an individual Motion to Dismiss. But because plaintiff's allegations largely overlap between defendants and the individual defendants make nearly identical arguments, the court analyzes each of plaintiff's claims generally, and addresses issues about each defendant as they arise. And because the court dismisses the claims against the individual defendants, the court addresses those claims first, before turning to the main event— the claims against ESU.

---

[3] Plaintiff also raises this claim under the Fifth Amendment, but "[t]he Due Process Clause of the Fifth Amendment applies only to action by the federal government[.]" *Koessel v. Sublette Cnty. Sheriff's Dep't*, 717 F.3d 736, 748 n.2 (10th Cir. 2013). Plaintiff doesn't sue any federal actors; he sues only state actors, which implicates the Fourteenth Amendment. *See id.* (explaining that "the Due Process Clause of the Fourteenth Amendment applies to actions by state governments"). Because plaintiff "alleges conduct only done by state authorities . . . there can be no Fifth Amendment claim." *Id.*

[4] The Third Amended Complaint does not include a Count III or Count VI, but the court will continue to use the numbering used in the Third Amended Complaint to avoid confusion. *See* Doc. 83.

### A.     Section 1983 Claims

A defendant is liable under § 1983 if, under color of state law, the defendant deprives a person of a constitutional right.  42 U.S.C § 1983.  Plaintiff alleges that the individual defendants have done just that.  He claims all individuals published false and defamatory statements about him during the investigation of J.J.'s complaint and the resulting controversy on ESU's campus.  Also, he claims that defendants Garrett and Cordle failed to follow certain procedures during the investigation.  For reasons discussed below, the court concludes plaintiff has failed to state a § 1983 claim against any of the individual defendants.

### 1.  Procedural Due Process Claim (Defendants Garrett and Cordle)

Plaintiff's first § 1983 claim is a general allegation that defendants Garrett and Cordle failed to follow certain procedures during the investigation of the harassment complaints filed against him.  Doc. 83 at 20–21 (Third Am. Compl. ¶ 136).

"'To assess whether an individual was denied procedural due process, courts must engage in a two-step inquiry:  (1) did the individual possess a protected interest such that the due process protections were applicable; and, if so, then (2) was the individual afforded an appropriate level of process.'"  *Guttman v. Khalsa*, 669 F.3d 1101, 1113–14 (10th Cir. 2012) (quoting *Hatfield v. Bd. of Cnty. Comm'rs*, 52 F.3d 858, 862 (10th Cir. 1995)).  Defendants Cordle and Garrett don't contest that plaintiff had a property interest in his continued employment.  Instead, they argue they afforded plaintiff all the process he was due—notice and a right to a hearing—and that they didn't deprive him of any property interest because the hearing concluded in plaintiff's favor.  They're right, so plaintiff fails to state a claim for two principal reasons.

*First*, plaintiff didn't lose any property interest in his employment at the end of the J.J. case. The faculty committee concluded there wasn't clear and convincing evidence that plaintiff violated ESU's harassment policy and so termination wasn't justified. Doc. 100-1 at 11 (Ex. E). To be sure, after the faculty committee's decision, Garrett decided she would suspend plaintiff should someone file another harassment complaint against him. *Id.* at 5 (Ex. B). But plaintiff maintained his employment, so he doesn't have a procedural due process claim on this front. *Teigen v. Renfrow*, 511 F.3d 1072, 1079 (10th Cir. 2007) ("Plaintiffs' property interest in their continued employment and employment status, however, cannot form the basis for their due process claims because they have not alleged they were terminated or deprived of their existing employment status as a result of [the challenged action]."). And Garrett's decision also to limit plaintiff's personal interactions with students doesn't support his claim either. Plaintiff doesn't allege he had a protected property interest in his personal interactions with students. So, any deprivation of that "interest" can't support his procedural due process claim. *See Eisenhour v. Weber Cnty.*, 744 F.3d 1220, 1232 (10th Cir. 2014) ("For purposes of the Fourteenth Amendment's Due Process Clause, property interests must derive from some independent source, such as state law, contract, or other understandings that give rise to a claim of entitlement.").

*Second*, the events surrounding plaintiff's administrative leave and eventual resignation don't support his claim either. Plaintiff argues that the "most clear-cut violation of [his] rights under the Due Process Clauses" was the second complaint of sexual harassment in March 2018. Doc. 110 at 5. But this argument faces an uphill climb. To start, the immediate result of the second harassment complaint was suspension with pay, not termination. And "[s]uspension with pay does not raise due process concerns." *Hicks v. City of Watonga*, 942 F.2d 737, 746 n.4

(10th Cir. 1991) (first citing *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 544–45 (1985); then citing *Pitts v. Bd. of Educ.*, 869 F.2d 555, 556 (10th Cir. 1989)).  The alleged longer-term result—the end of plaintiff's employment with ESU—also doesn't support his procedural due process claim because plaintiff resigned before the investigation into the second complaint concluded.  And "if an employee voluntarily relinquishes a property interest, then no procedural due process violation has occurred."  *Narotzky v. Natrona Cnty. Mem'l Hosp. Bd. of Trustees*, 610 F.3d 558, 564 (10th Cir. 2010) (citing *Yearous v. Niobrara Cnty. Mem'l Hosp.*, 128 F.3d 1351, 1355 (10th Cir. 1997)); *see also McBeth v. Himes*, 598 F.3d 708, 724 (10th Cir. 2010) ("[Plaintiff]'s claim is that she did not receive adequate process when she chose to forego the process that she would have been afforded in a suspension proceeding.  That claim is insufficient as a matter of law to state a procedural due process violation.").

Even if these roadblocks didn't exist, plaintiff still fails to state a procedural due process claim.  Plaintiff's Complaint alleges that the letter informing him of the second harassment complaint violated due process because it failed to provide any specific details about the allegation.  He alleges that the letter did not "refer to any specific dates, times, locations, or the number of alleged incidents[.]"  Doc. 83 at 13 (Third Am. Compl. ¶¶ 86–87).  But the letter—which ESU attached as an exhibit to its Motion to Dismiss—did provide plaintiff with specific details.  It explained that the "report alleges that in the 2016 fall semester, [plaintiff] offered sexual encounters to a student in exchange for not reporting the student for academic misconduct," and that a sexual relationship then followed through the summer of 2017, including encounters in specific locations including a campus building and the complainant's private residence.  Doc. 100-1 at 9 (Ex. D).[5]  "[A]lthough [the court] accept[s] all well-pleaded

_____

[5] The letter produced in this attachment is signed by defendant Lauber, but plaintiff alleges that he received an identical letter from Cordle.  Doc. 83 at 13 (Third Am. Compl. ¶ 85).

allegations as true and draw[s] all reasonable inferences in favor of the plaintiff, if there is a conflict between the allegations in the complaint and the content of the attached exhibit, the exhibit controls." *Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 861 F.3d 1081, 1105 (10th Cir. 2017). So, the letter informing plaintiff of the second harassment complaint overrides plaintiff's allegations. And the court concludes that the letter provided plaintiff adequate notice of the second harassment complaint. *Cf. VanNahmen v. Dodge City Cmty. Coll.*, No. 17-CV-1174-EFM, 2018 WL 3744059, at *5 (D. Kan. Aug. 7, 2018) (concluding plaintiff sufficiently alleged lack of adequate notice where university's notice of charges "only vaguely refer[red] to disorderly and threatening behavior, without providing any context other than that it allegedly occurred 'on or about' two specific dates").

In the end, no matter how you look at it, plaintiff fails to state a procedural due process claim.[6]

---

[6] Plaintiff argues several other procedural irregularities amounted to due process violations, but none of them have merit.

*First*, he argues Cordle violated his due process rights by failing to step in and re-evaluate the investigation of J.J.'s complaint under the clear and convincing evidence standard after the Department of Education issued new guidance. But the Eighth Circuit has concluded that "the choice between the competing standards of proof is within the range of options available to a public university under the Constitution." *Doe v. Univ. of Ark.-Fayetteville*, 974 F.3d 858, 868 (8th Cir. 2020) ("[W]e do not think a higher standard of proof is compelled by the Constitution."). The court agrees with that conclusion. The court has found no Tenth Circuit case law addressing this issue, but the court predicts, if presented with this issue, the Tenth Circuit would find the Eighth Circuit's analysis persuasive and would apply it to the facts alleged here. *See Messeri v. DiStefano*, 480 F. Supp. 3d 1157, 1167 (D. Colo. 2020) ("Thus far, it appears that no federal court has concluded that students accused of sexual assault are entitled to a standard of proof requiring 'clear and convincing' evidence in disciplinary proceedings." (collecting cases)).

*Second*, plaintiff argues that Cordle violated his rights to non-disclosure under the Family and Education Rights and Privacy Act (FERPA), 20 U.S.C § 1232g(b), by failing to enforce J.J.'s confidentiality agreement with ESU. But plaintiff acknowledges FERPA doesn't provide individually enforceable rights. The Supreme Court has said "FERPA's provisions speak only to the Secretary of Education, directing that '[n]o funds shall be made available' to any 'educational agency or institution' which has a prohibited 'policy or practice'" of disclosing educational records. *Gonzaga Univ. v. Doe*,

### 2.   "Stigma-Plus" Claim

Plaintiff's second § 1983 claim is about defendants' alleged stigmatizing and defamatory statements before and after the J.J. proceedings.  His allegations against each defendant mostly overlap and fall into three separate groups:  (1) alleged stigmatizing statements in the internal report of J.J.'s harassment complaint against plaintiff; (2) alleged stigmatizing statements made by J.J. in *The Bulletin*; and (3) alleged stigmatizing statements made by defendant Garrett in *The Bulletin*.

A state official deprives a plaintiff of his liberty interest without due process of law when he makes a defamatory statement about the plaintiff and that statement causes an alteration in plaintiff's legal status.  *Brown v. Montoya*, 662 F.3d 1152, 1167 (10th Cir. 2011) (citing *Paul v. Davis*, 424 U.S. 693 (1976)).  The alleged deprivation of a plaintiff's liberty interest in his reputation and the resulting change in legal status is known as a "stigma-plus" claim.  *See, e.g.*, *Guttman*, 669 F.3d at 1125.  In the context of public employment, the Tenth Circuit has held that an employee acquires an actionable "stigma-plus" claim where a governmental supervisor defames the employee during the course of termination, foreclosing other employment opportunities.  *McDonald v. Wise*, 769 F.3d 1202, 1212 (10th Cir. 2014) (citing *Workman v. Jordan*, 32 F.3d 475, 480 (10th Cir. 1994)).

To state a "stigma-plus" claim, plaintiff must allege facts to support four elements:  "(1) [the government employer] makes a statement that 'impugn[s] the good name, reputation, honor, or integrity of the employee'; (2) the statement is false; (3) the statement is made during the course of termination and 'foreclose[s] other employment opportunities'; and (4) the

---

536 U.S. 273, 287 (2002) (quoting 20 U.S.C. § 1232g(b)(1)) (alteration in original).  If there's no individual right under FERPA, the court fails to see how a violation of that statute can support a procedural due process claim.  Plaintiff provides no authority saying it can.

statement is published, in other words disclosed public[ly]." *Id.* (quoting *Workman*, 32 F.3d at 481) (footnotes and emphasis omitted).

Before getting into the weeds of plaintiff's allegations, all five defendants raise a common argument that, they argue, disposes of his claim. And it's quite simple: plaintiff wasn't terminated. He resigned. And even more importantly, any defamatory or stigmatizing statements were made several months *before* he resigned. So, defendants argue, plaintiff fails to allege the third element of a stigma-plus claim—that the alleged defamatory statements were made during the course of termination. *See, e.g.*, Doc. 92 at 12. They're right.

To decide whether a plaintiff has alleged sufficiently that the defamatory statements were made during the course of termination, the court focuses on the "'manner in which a public employee is terminated,' and the statements made 'incident to the termination.'" *Renaud v. Wyo. Dep't of Fam. Servs.*, 203 F.3d 723, 727 (10th Cir. 2000) (first quoting *Miller v. City of Mission*, 705 F.2d 368, 373 (10th Cir. 1983); then quoting *Siegert v. Gilley*, 500 U.S. 226, 234 (1991)); *see also Bjorklund v. Miller*, 467 F. App'x 758, 768 (10th Cir. 2012) ("A 'roughly contemporaneous statement[ ]' made 'incident to the termination' that concerns the 'manner or reasons for [the employee's] termination' may qualify as one made 'in the course of termination of employment.'" (quoting *Renaud*, 203 F.3d at 727)). If plaintiff wasn't terminated, this analysis becomes quite difficult for the plaintiff, if not impossible. Indeed, the Supreme Court has rejected a "stigma-plus" liberty interest claim where the plaintiff "voluntarily resigned from his position" and so "[t]he alleged defamation was not uttered incident to the termination of [the plaintiff's] employment" as a matter of law. *Siegert*, 500 U.S. at 234. Plaintiff offers no cases holding otherwise and the court's research found none.

Plaintiff counters by arguing constructive discharge.  For some reason, he directly argues constructive discharge only in one of his Oppositions—the one opposing defendant Moritz's Motion to Dismiss.  Doc. 108 at 5.  His response to all the other motions to dismiss is that defamatory statements don't have to cause the termination directly so long as they occur during the course of the termination, and that the statements published in *The Bulletin* satisfy this standard.  *See, e.g.*, Doc. 110 at 9.  Sure enough, plaintiff is right that the "publication of defamatory statements need not be strictly contemporaneous with a termination to occur in the course of the termination of employment."  *Renaud*, 203 F.3d at 727.  But that doesn't help plaintiff because the alleged defamatory statements were published in *The Bulletin* in March 2018, and plaintiff didn't resign from ESU for another nine months, in December 2018.  Doc. 83 at 14 (Third Am. Compl. ¶ 98).  So, even accepting plaintiff's constructive discharge theory, any defamatory statements were not even "roughly contemporaneous" with his termination. *Renaud*, 203 F.3d at 727 ("Timing is certainly one consideration in determining whether stigmatizing statements are made in the course of the termination of employment.").  In *Renaud*, the Tenth Circuit held that a gap of a few days between plaintiff's termination and the alleged defamatory statements didn't, by itself, defeat plaintiff's claim.  *Id.* at 727.  Instead, the *Renaud* plaintiff's claim failed because "the alleged defamation had nothing to do with the reasons for termination."  *Id.* at 728.

But here, plaintiff has a much bigger timing problem.  The alleged defamatory statements occurred *nine months* before plaintiff's alleged constructive discharge.  It's difficult to imagine a "course of termination" that spans nine months.  And the Complaint here alleges nothing to suggest that this plaintiff's course of termination lasted so long.  Because any defamatory statements were not made during the course of a termination, plaintiff has no

actionable "stigma-plus" claim.  *Id.* at 728 ("While the statements may have injured Plaintiff and may well have affected his opportunities for future employment, they did not occur *in the course* of the termination of employment.").

Even were this not the case, plaintiff's claim still fails.  To avoid belaboring the point for each defendant, the court briefly addresses the three groups of alleged defamatory statements described above and discusses any individual arguments about each defendant as they arise.

### a.  The Report (Defendants Moritz, Lauber, Cordle)

Plaintiff's first focus is on the alleged false and defamatory statements in the internal report of J.J.'s harassment complaint and that report's ascension up ESU's chain of command. At step one of the chain was Moritz, ESU's Title IX investigator who wrote the report.  Next was Lauber, ESU's Human Resources Director, who accepted Moritz's report and summarized her findings.  And finally came Cordle, ESU's Provost, who then accepted Lauber's summary of Moritz's report and began termination proceedings against plaintiff.  (Notably, plaintiff does not allege that Cordle made any statements at all).  Plaintiff doesn't allege any material differences between these three defendants.  He merely alleges that each defendant, by accepting Moritz's defamatory report, is liable for the resulting stigma that has blocked his future employment opportunities.[7]  So, the court will focus its analysis on Moritz's report and then, when necessary, address Lauber and Cordle.

Plaintiff's Complaint alleges that Moritz's report was "filled with at least twenty inaccuracies, inconsistencies and omissions and included Moritz'[s] own theories that are unsupported by facts or reasonable inferences about what occurred."  Doc. 83 at 5 (Third Am.

---

[7] Plaintiff also alleges that "Lauber had multiple conflicts of interest including an open conflict of interest in the matter that involved dealings with [plaintiff] that extended back to 2012 and that created a bias against [plaintiff]."  Doc. 83 at 7 (Third Am. Compl. ¶ 53).  But this allegation is irrelevant to the only claim that plaintiff brings against Lauber.

Compl. ¶ 34).  Defendant Moritz says this is conclusory because plaintiff doesn't say what these twenty falsehoods are.  Doc. 98 at 9.  While that's true, the court determines that plaintiff's Complaint fairly alleges at least one potentially defamatory statement from Moritz:  her conclusion that plaintiff proposed a "quid pro quo" to J.J. and that he "more likely than not" violated ESU policy on sexual harassment.  Doc. 83 at 6, 7 (Third Am. Compl. ¶¶ 44, 50). Lauber reached this same conclusion in his summary of Moritz's report.  *Id.* at 7, 8 (Third Am. Compl. ¶¶ 51–52, 56).

But defendants highlight other problems that ultimately doom plaintiff's claim.  *First*, as discussed above, these statements weren't made during the course of termination; they were made in the lead-up to a hearing where plaintiff *wasn't* terminated.  *Second*, plaintiff doesn't allege that Moritz published her alleged defamatory statement.  Instead, he alleges only that she delivered her report to Lauber.  Doc. 83 at 5 (Third Am. Compl. ¶ 33).  And "intra-government dissemination, by itself, falls short of the Supreme Court's notion of publication: 'to be made public.'" *Asbill v. Hous. Auth. of Choctaw Nation of Okla.*, 726 F.2d 1499, 1503 (10th Cir. 1984) (quoting *Bishop v. Wood*, 426 U.S. 341, 348 (1976)); *see also Lollis v. City of Eufaula*, 249 F. App'x 20, 25 (10th Cir. 2007) ("[Plaintiff] does not specifically allege how or to whom the statements were published.  There is no evidence that the Defendants caused the information contained in the Checotah officers' statements or the reprimand to be published outside the Police Department or City Council, as is required to establish his claim.").[8]  Although plaintiff's Complaint does say Lauber "released" a summary of Moritz's report, Doc. 83 at 7 (Third Am. Compl. ¶ 51), the Complaint does not allege that Lauber made the summary public.  Indeed,

---

[8] The Tenth Circuit has acknowledged that it has not "precisely defined the scope of intra-government disseminations." *Alcorn v. La Barge, Wyo.*, 784 F. App'x 614, 619 (10th Cir. 2019).  But this case doesn't present any complicated issues of publication between different units of government. Plaintiff never alleges that ESU disseminated the report outside of the university.

elsewhere in the Complaint, plaintiff alleges Cordle merely "accept[ed]" Lauber's summary. *Id.* at 8 (Third Am. Compl. ¶ 61).

Because plaintiff fails to allege the third and fourth elements of a "stigma-plus" deprivation of liberty interest claim against defendants Moritz, Lauber, or Cordle, the court dismisses those claims, for these two separate and independent reasons.

### b.   J.J.'s Statements in *The Bulletin* (Defendants Cordle and McCoy)

Plaintiff's second focus is the series of stories published by *The Bulletin* in the spring of 2018—specifically, J.J.'s allegedly defamatory and stigmatizing statements about plaintiff and her harassment complaint. But plaintiff isn't suing J.J. He is suing Cordle, ESU's Provost, and McCoy, the faculty advisor of *The Bulletin*. And he alleges that they are both responsible for J.J.'s statements because they failed to enforce her confidentiality agreement with ESU. Doc. 83 at 22 (Third Am. Compl. ¶¶ 143–44). There are several problems with this argument.

For starters, plaintiff doesn't allege that Cordle or McCoy personally made any stigmatizing statements; he alleges they are responsible for J.J.'s stigmatizing statements. But "vicarious liability is inapplicable to . . . § 1983 suits[.]" *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009); *Robbins v. Oklahoma*, 519 F.3d 1242, 1251 (10th Cir. 2008) ("In general, state actors may only be held liable under § 1983 for their own acts, not the acts of third parties."). "[P]laintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676. And the only personal action plaintiff has pleaded—Cordle and McCoy's failure to act—is not a basis for § 1983 liability. *Darr v. Town of Telluride*, 495 F.3d 1243, 1256 (10th Cir. 2007) ("'[L]iability under § 1983 must be predicated upon a "*deliberate*" deprivation of constitutional rights by the defendant, and not on negligence.'" (quoting *Jojola v. Chavez*, 55 F.3d 488, 490 (10th Cir.

1995))).  Finally, even if a failure to act was a basis for liability, plaintiff does not allege that either Cordle or McCoy were parties to the confidentiality agreement or otherwise had the power to enforce it to prevent J.J. from speaking to *The Bulletin*.

For those reasons, the claims asserted on this basis against Cordle and the entire claim against McCoy also fail.

### c.  Garrett's Statements in *The Bulletin*

The claims against Garrett, ESU's President, suffer a similar fate.  But different reasons produce their outcome.  Plaintiff alleges that Garrett made several specific statements published in *The Bulletin* in the spring of 2018 that defamed him and blocked any hopes of future employment as a professor at other universities.  Unlike the claims against the other defendants, plaintiff's allegations against Garrett sufficiently plead the publication element.  The main issue then is whether Garrett's alleged statements were false and "'impugn[ed] [plaintiff's] good name, reputation, honor, or integrity[.]'"  *McDonald*, 769 F.3d at 1212 (quoting *Workman*, 32 F.3d at 481).  They didn't.

Plaintiff alleges the following defamatory statements from Garrett:

1.  Garrett's statement, published in *The Bulletin* on March 1, 2018 that she supported the #MeToo movement and that any woman of a certain age, including herself "would be able to point to certain things that have happened to them that fall in that category."  Doc. 83 at 11 (Third Am. Compl. ¶ 76).

2.  Garrett's statement at an ESU town hall about J.J.'s complaint, as reported by *The Bulletin* on March 15, 2018, that although she agreed with the faculty committee's unanimous decision that there wasn't clear and convincing evidence that plaintiff violated the harassment policy, she didn't know "how people would have come out on the preponderance of evidence if

that had been the standard applied here, given the additional information that was available." *Id.* at 11 (Third Am. Compl. ¶ 77).

3.   Garrett's letter to the university, published in *The Bulletin* on March 28, 2018 under the headline "Professor at Center of Sexual Assault Controversy Placed on Administrative Leave," announcing that ESU suspended plaintiff because of "new information that has come to our attention."  In the letter, Garrett explained she was "stepping outside of our standard protocols to share this limited information," because of "significant community interest" in the matter, and because ESU would "not tolerate inaction or complacency when change needs to be made."  Doc. 83 at 12–13 (Third Am. Compl. ¶¶ 80, 83–84).

4.   Garrett's statement, published in *The Bulletin* on January 24, 2019, that "our culture hasn't yet arrived at what we would all hope would be a situation where women don't have to deal with things that are inappropriate in the workforce or in the workplace[.]"  Doc. 83 at 14–15 (Third Am. Compl. ¶ 99).

The first and fourth statements don't even mention plaintiff.  So, they can't impugn his "'good name, reputation, honor, or integrity.'"  *McDonald*, 769 F.3d at 1212 (quoting *Workman*, 32 F.3d at 481); *Monroe v. City of Lawrence*, 124 F. Supp. 3d 1097, 1124–25 (D. Kan. 2015) (granting summary judgment against plaintiff's deprivation of liberty claim because he produced no evidence that the allegedly defamatory statements concerned him); *see also id.* at 1126 & n.100 (collecting Tenth Circuit cases establishing that "a speaker must directly associate false information with a particular person's identity before [her] statements may impugn").

The most relevant part of the second statement—Garrett saying she "d[idn't] know how people would have come out on the preponderance of evidence if that had been the standard

24

applied here, given the additional information that was available"—is mere speculation, which is closer to a statement of opinion than a statement of fact. And statements of opinion cannot support a "stigma-plus" claim. *Flanagan v. Munger*, 890 F.2d 1557, 1572 (10th Cir. 1989) (affirming summary judgment against a deprivation of liberty claim because the statements "were not true facts [but] were merely opinion and did not contain personal information").

The third statement—announcing that ESU placed plaintiff on administrative leave—wasn't false and plaintiff doesn't argue that it was. So, that statement can't support a claim either. *Id.* ("Because plaintiffs did not show that any of [defendant's] statements to the media were false, they have failed to support a claim for deprivation of liberty under section 1983."). And any possible impression that plaintiff was placed on administrative leave because he committed sexual harassment "was created by the newspaper's juxtaposition" of its headline about sexual assault and Garrett's statement that ESU had placed plaintiff on administrative leave because of "new information." *Russillo v. Scarborough*, 935 F.2d 1167, 1172 (10th Cir. 1991) (holding that government employer's statements were not false and thus not actionable even though newspaper reporting those comments may have created a false and stigmatizing impression). "It is not enough that a defendant disseminate information that would allow a savvy journalist to print statements implying plaintiff's participation in stigmatizing conduct; the statements must 'charge' plaintiff with stigmatizing conduct." *Monroe*, 124 F. Supp. 3d at 1126 (citing *Melton v. City of Okla. City*, 928 F.2d 920, 930 (10th Cir. 1991)). Garrett's statement doesn't charge plaintiff with stigmatizing conduct; it simply asserts that ESU placed him on administrative leave.

Thus, plaintiff fails to state a "stigma-plus" claim against Garrett. So, the court dismisses that claim as well.

### 3. Qualified Immunity

Each of the individual defendants also assert qualified immunity in their supporting briefs of their Motions to Dismiss, *see* Doc. 90 at 9–10, 12–13 (Cordle); Doc. 92 at 10–11, 13 (Garrett); Doc. 94 at 9–10 (Lauber); Doc. 96 at 8–9 (McCoy); Doc. 98 at 10–11 (Moritz), and that provides an independent reason to dismiss plaintiff's § 1983 claims.

A state official sued in his individual capacity for money damages is entitled to qualified immunity unless plaintiff can show "(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  A court should endeavor to resolve an assertion of qualified immunity "'at the earliest possible stage in litigation.'"  *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (quoting *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (per curiam)).  That's because "qualified immunity is 'an immunity from suit rather than a mere defense to liability[.]'"  *Id.* at 231 (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)).  It "is meant to give government officials a right, not merely to avoid 'standing trial,' but also to avoid the burdens of 'such pretrial matters as discovery[.]'"  *Behrens v. Pelletier*, 516 U.S. 299, 308 (1996) (quoting *Mitchell*, 472 U.S. at 526) (emphasis omitted).  Up against a § 1983 claim, the "doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Pearson*, 555 U.S. at 231 (quoting *Harlow*, 457 U.S. at 818).

As the above analysis shows, none of the five individual defendants violated plaintiff's rights under the Fourteenth Amendment to the United States Constitution.  They are thus

entitled to qualified immunity, and the court dismisses plaintiff's § 1983 claims for another

reason:  qualified immunity precludes liability.

###    B.    Federal Claims for Discrimination

Now, on to the heart of this lawsuit—the claims against Emporia State.

Plaintiff brings two discrimination claims against ESU:  one under Title VII of the Civil

Rights Act of 1964 and one under Title IX of the Education Amendments of 1972.  Ordinarily,

the court could analyze these claims the same way.  That is because Title VII "prohibits

employers from discriminating against an individual 'because of such individual's . . . sex.'"

*Hiatt v. Colo. Seminary*, 858 F.3d 1307, 1315 (10th Cir. 2017) (quoting 42 U.S.C. § 2000e-

2(a)).  And Title IX "provides similar protections," including "a prohibition on employment

discrimination in federally funded educational programs."  *Id.* (citing 20 U.S.C. § 1681(a));

*Throupe v. Univ. of Denver*, 988 F.3d 1243, 1251 (10th Cir. 2021) ("'[C]ourts have generally

assessed Title IX discrimination claims under the same legal analysis as Title VII claims.'"

(quoting *Gossett v. Okla. ex rel. Bd. of Regents*, 245 F.3d 1172 (10th Cir. 2001))).  Indeed, the

usual case raising claims under both Title VII and Title IX involves plaintiffs who lost their jobs

at colleges or universities and allege discrimination in employment because of their sex.  So, the

analysis under either statute is the same.  *See Hiatt*, 858 F.3d at 1316–17 (analyzing Title VII

and Title IX claims together where university employee was demoted and eventually resigned

after university expressed concern with her supervisory approach); *see also Throupe*, 988 F.3d

at 1251 (analyzing male professor's Title IX claim just like a Title VII claim even though he

didn't bring a Title VII claim because he claimed discrimination because of sex when he was

given unfavorable course schedules after the university discovered his relationship with a

female student); *Dickerson v. Bd. of Trs. of Metro. State Univ. of Denver*, No. 19-CV-2087-

WJM-SKC, 2021 WL 492483, at *7 (D. Colo. Feb. 10, 2021) (analyzing Title VII and Title IX reverse sex discrimination claims together where university revoked offer of employment to plaintiff after receiving complaints from students). But none of the plaintiffs in those cases were subjects of a Title IX investigation.

Plaintiff here was the subject of a Title IX investigation. And there is a body of caselaw about Title IX investigations that has evolved a bit differently than employment discrimination cases, as explained more below. *See Doe v. Univ. of Denver*, 1 F.4th 822, 829–30 (10th Cir. 2021) (*Doe II*) (providing overview of Title IX analytical frameworks that have developed in other circuits). That is because plaintiffs in those cases are usually *students* claiming gender bias in the Title IX investigation; they are not employees claiming sex discrimination and so have no claim under Title VII. *See, e.g.*, *id.* at 829–30; *Doe v. Univ. of Denver*, 952 F.3d 1182, 1186 (10th Cir. 2020) (*Doe I*).[9] But plaintiff here is essentially raising the same claim under Title IX that those students raised in those cases: that the Title IX investigation and proceedings were biased against him because he is a man.

So, the court will analyze the Title VII and Title IX claims differently. Fairly read, plaintiff's Title VII claim focuses on employment discrimination, resulting in his alleged constructive discharge; his Title IX claim focuses on gender bias in the Title IX proceeding, specifically ESU's decision (through President Garrett) to sanction plaintiff after the faculty committee cleared him of misconduct. *Compare* Doc. 83 at 17 (Third Am. Compl. ¶ 113) (Title VII claim focused on plaintiff's "constructive discharge"), *with id.* (Third Am. Compl. ¶ 117)

---

[9] The court uses the short forms *Doe I* and *Doe II* to distinguish these two recent Tenth Circuit cases. Although they involved different plaintiffs, the Tenth Circuit referred to the earlier case as *Doe I*, and so the court will follow the Circuit's lead. Also worth mentioning, several of the Title IX cases cited in this Order name "Doe" as plaintiff as well. But the court will refer to those cases by some other party name to avoid confusion with *Doe I* and *Doe II*, the leading Tenth Circuit cases on this issue.

(Title IX claim focused on "*discipline* and constructive discharge" (emphasis added)); *see also* Doc. 113 at 7 (arguing that plaintiff was "the target of a biased and unfair Title IX inquiry" and citing *Doe I*, where a student plaintiff alleged gender bias in a Title IX proceeding).[10]  Because the Tenth Circuit has articulated different standards for these different claims, the court concludes that although plaintiff has not pleaded a Title VII claim sufficiently, he has pleaded a Title IX claim sufficiently, for reasons explained below.[11]

### 1.   Title VII—Reverse Sex Discrimination

"While the 12(b)(6) standard does not require that Plaintiff establish a prima facie case in [his] complaint, the elements of each alleged cause of action help to determine whether Plaintiff has set forth a plausible claim."  *Khalik v. United Air Lines*, 671 F.3d 1188, 1192 (10th Cir. 2012).  So, the court begins by explaining how a plaintiff establishes a prima facie case of reverse sex discrimination under Title VII.

Title VII prohibits discrimination in employment "because of . . . sex[.]"  42 U.S.C § 2000e-2(a)(1).  A plaintiff can prove a Title VII violation through either direct evidence of discrimination or circumstantial evidence under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *Khalik*, 671 F.3d at 1192.  Under *McDonnell-Douglas*, the plaintiff typically establishes a prima facie case of discrimination by showing that:

---

[10] To be sure, plaintiff's Complaint and his papers are less than clear.  His Third Amended Complaint refers to both the Title VII and Title IX claims as ones for "Reverse Sex Discrimination." Doc. 83 at 16–17 (Third Am. Compl., Counts I and II).  And his response to ESU's Motion to Dismiss argues that for "allegations of gender discrimination by employees of educational institutions that receive federal funds, [c]ourts tend to apply Title VII and Title IX similarly[.]"  Doc. 113 at 6.  But at this stage, the court must draw all reasonable inferences in plaintiff's favor and read his Complaint in a way most favorable to him.  That requires reading his Title IX claim as one focused on gender bias in the Title IX proceeding—because it is the only federal claim that plaintiff has pled sufficiently.

[11] But to the extent plaintiff also raises a Title IX employment discrimination claim, that claim falls the same way as the Title VII claim.

"(1) [ ]he is a member of a protected class, (2) [ ]he suffered an adverse employment action, (3) [ ]he qualified for the position at issue, and (4) [ ]he was treated less favorably than others not in the protected class." *Id.* "For most plaintiffs, establishing a prima facie case is perfunctory, and liability turns on whether the defendant's stated explanation for the adverse employment action is pretextual." *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1201 (10th Cir. 2006).

But reverse discrimination cases are different. Because "members of the majority group are not necessarily entitled to a presumption of discrimination afforded to members of a minority group," *Mattioda v. White*, 323 F.3d 1288, 1292 (10th Cir. 2003), the prima facie case for reverse discrimination requires a "stronger showing," *Argo*, 452 F.3d at 1201. Reverse discrimination plaintiffs can make this stronger showing in one of two ways.

The first alternative modifies the initial element of the prima facie case, described above. Instead of showing that he is a "member of a protected class"—normally the first component of the prima facie case—the reverse discrimination plaintiff must "establish background circumstances that support an inference that the defendant is one of those unusual employers who discriminates against the majority." *Notari v. Denver Water Dep't*, 971 F.2d 585, 589 (10th Cir. 1992). When the plaintiff invokes this alternative, the other three components of the prima facie case remain the same.

Under the second alternative, the plaintiff may establish his entire prima facie case by presenting "indirect evidence sufficient to support a reasonable probability that but for the plaintiff's status" he would not have suffered the challenged employment decision. *Id.* at 590. This "but for" alternative replaces the entire prima facie case requirement normally applied in discrimination cases. But a reverse discrimination plaintiff cannot "merely . . . allege

that he was qualified and that someone with different characteristics was the beneficiary of the challenged employment decision." *Id.* "Instead, [such a] plaintiff must allege . . . facts that are sufficient to support a reasonable inference that but for plaintiff's status the challenged decision would not have occurred." *Id.* If a reverse discrimination plaintiff satisfies either formulation for the prima facie case, then the remainder of the *McDonnell Douglas* framework applies. *Id.* at 591. Of course, at the motion to dismiss stage, plaintiff need not produce evidence or specific facts; but he must allege facts sufficient to establish a plausible inference that his employer has committed reverse sex discrimination.

ESU argues plaintiff failed to satisfy either of these alternatives, focusing mainly on the failure to allege "background circumstances."[12] *See* Doc. 100 at 12 ("Plaintiff does not allege a prima facie case of reverse sex discrimination . . . . Quite simply, alleging ESU discriminates against men is so preposterous . . . Plaintiff doesn't bother to actually say it."). Plaintiff responds that ESU is that "unusual employer" that discriminates against men because of two

---

[12] ESU also argues that it did not constructively discharge plaintiff because he resigned. "'[C]onstructive discharge occurs when the employer by its illegal discriminatory acts has made working conditions so difficult that a reasonable person in the employee's position would feel compelled to resign.'" *Hiatt*, 858 F.3d at 1318 (quoting *Bennett v. Windstream Commc'ns, Inc.*, 792 F.3d 1261, 1269 (10th Cir. 2015)) (alteration in original). "'To establish constructive discharge, a plaintiff must show that [ ]he had no other choice but to quit.'" *Id.* (quoting *Bennett*, 792 F.3d at 1269). While ESU is correct that a person who voluntarily resigns cannot claim that he was constructively discharged, "the voluntariness of a plaintiff's resignation is the lynchpin of a constructive discharge claim and is a question of fact that cannot be decided at the pleading stage of litigation." *Steele v. City of Topeka*, No. 2:14-CV-02094-EFM-GL, 2014 WL 3734185, at *3 (D. Kan. July 29, 2014). And the court cannot conclude at this stage, after viewing all the allegations in plaintiff's Complaint in the light most favorable to him, that he failed to plead constructive discharge. According to his Complaint, plaintiff was cleared of sexual harassment in December 2017, but then after intense media coverage on campus, including ESU President Garrett soliciting complaints about him, a second harassment complaint was filed against him and he was placed on administrative leave. And with the investigation pending for nine months, during which time Garrett suggested publicly that plaintiff could resign, and plaintiff was unable to secure employment elsewhere, he resigned. The court concludes that these allegations, at this stage, sufficiently allege a constructive discharge.

comments made by Garrett in *The Bulletin*.  Doc. 113 at 7–8.  In the first (in April 2018, shortly after the second harassment complaint), Garrett explained that:

> A faculty member, when presented with . . . notice of intent to dismiss, has the option, at that point and time to simply leave the university or of demanding this, what is essentially a hearing, it is much like a trial, and if credible evidence is found, if a notice of intent to dismiss is issued, then it is up to the individual involved, whether [plaintiff] or someone else, to decide whether to simply leave the university or to move forward with the demand for the hearing.

Doc. 113 at 7–8 (emphasis omitted); Doc. 83 at 14 (Third Am. Compl. ¶ 94) ("In one story published in *The Bulletin* on April 5, 2018, Garrett invited [plaintiff] to resign by saying that he could resolve the whole situation by resigning." (emphasis added)).

In the second statement (in January 2019, shortly after plaintiff's resignation), Garrett stated that "our culture hasn't yet arrived at what we would all hope would be a situation where women don't have to deal with things that are inappropriate in the workforce or in the workplace."  Doc. 83 at 14–15 (Third Am. Compl. ¶ 99).  Plaintiff argues this statement "linked [his] separation with the cause of women's rights," demonstrating that ESU "*is* one of those peculiar employees who will discriminate against men."  Doc. 113 at 8.  The court disagrees.  The first statement says nothing about plaintiff's status as a man.  And the second statement, although generally discussing women in the workplace, says nothing about ESU's actions toward its employees, let alone its male employees.  So, the court concludes, plaintiff fails to allege "background circumstances" sufficient to meet the first alternative for making a "stronger showing" of a prima facie case of reverse sex discrimination.  *Cf. Reynolds v. Sch. Dist. No. 1*, 69 F.3d 1523, 1535 (10th Cir. 1995) (holding plaintiff showed background circumstances where she "was the only white employee in the otherwise all-Hispanic Bilingual/ESOL Department, and Hispanic supervisors made most of the employment decisions of which [she] complain[ed]"); *Perez v. Unified Gov't*, No. 10-CV-2107-JAR/GLR, 2011 WL 2038689, at *6

(D. Kan. May 25, 2011) (finding plaintiff showed background circumstances in the "workforce composition" of employer, where of "the twenty-six employees . . . only four or five are men," "only women are in managerial or leadership roles . . . and the few men who are employed . . . are manual laborers").

To be sure, and though not cited by plaintiff, several decisions from our court have concluded that, at the motion to dismiss stage, "a failure to allege sufficient 'background circumstances' about the employer, *standing alone*, is not relevant and not a reason for dismissal." *Seymour v. Tonganoxie USD 464*, No. 20-2282-JWL, 2020 WL 6742791, at *2 (D. Kan. Nov. 17, 2020) (emphasis added); *see also Slyter v. Bd. of Cnty. Comm'rs for Anderson Cnty.*, No. 11-4044-JAR, 2011 WL 6091745, at *3 (D. Kan. Dec. 7, 2011) ("To the extent there is insufficient direct evidence of reverse discrimination, or of the requisite background circumstances under a *McDonnell Douglas* approach, that is an issue properly reserved for summary judgment."). This makes sense because *Notari* provides reverse discrimination plaintiffs two *alternative* ways to establish a prima facie case, as discussed above.

But plaintiff doesn't simply fail to allege background circumstances establishing that ESU discriminates against men. He also fails to allege *any* facts "'to support a reasonable inference that but for [his] status [as a man] the challenged decision [his constructive discharge] would not have occurred.'" *Argo*, 452 F.3d at 1201 (quoting *Notari*, 971 F.2d at 590). Thus, he also fails *Notari*'s second alternative for alleging a prima facie case of reverse sex discrimination. The only allegations in his Complaint even hinting at differential treatment are Garrett's comments about women in the workplace. Plaintiff argues that Garrett's failure to mention anything about men as victims of sexual harassment is proof of differential treatment.

*See* Doc. 83 at 11, 14–15 (Third Am. Compl. ¶¶ 76, 99).  But this is not enough to support a Title VII discrimination claim, even at this stage.

In the cases from our court allowing plaintiffs to proceed with reverse discrimination claims—even in the absence of "background circumstances"—the plaintiffs alleged facts establishing a plausible inference of differential treatment because of sex.  *Seymour*, 2020 WL 6742791, at *2 (concluding that failure to allege "background circumstances" was not fatal to plaintiff's claims where plaintiff alleged supervisor excluded him from meetings that similarly situated female employees attended and plaintiff's job duties were reassigned); *Walker v. Answer Topeka, Inc.*, No. 20-2049-EFM, 2020 WL 4200878, at *4 (D. Kan. July 21, 2020) (finding background circumstances irrelevant because plaintiff alleged differential treatment between himself and his female coworkers, including "several instances of his female coworkers engaging in the same activity that got him fired" without any consequence); *Mackley v. TW Telecom Holdings, Inc.*, 296 F.R.D. 655, 666 (D. Kan. 2014) (finding plaintiff sufficiently alleged reverse discrimination because he was given different work assignments and office hours than his fellow female employees and "even though his performance numbers were superior to similarly situated female employees he was nonetheless terminated"); *Slyter*, 2011 WL 6091745, at *3 (denying motion to dismiss for failure to allege background circumstances because plaintiff alleged that "he reported several departmental policy violations by a junior female employee, that she was not disciplined for these violations, and that [he] was terminated for violating an unwritten [p]olicy that he was not previously made aware of soon after reporting [the] violations").

In short, plaintiff has alleged no facts that plausibly could establish that ESU treated him differently from his fellow employees because he was a man. The court thus dismisses his Title VII reverse sex discrimination claim.

### 2. Title IX—Gender Bias in the Proceeding

Plaintiff's Title IX claim fares differently for two reasons. *First*, as explained before, his Title IX claim has a different focus. This claim doesn't theorize that he was treated differently from other employees at ESU because he was a man. Instead, it asserts that ESU's decision to sanction plaintiff even after the faculty committee cleared him of misconduct amounted to gender bias. *Second*, the pleading standard for this claim is different. The Tenth Circuit recently announced the "operative question" for a claim of gender bias originating in a Title IX investigation is whether the facts alleged, if true, raise a plausible inference "that sex was a *motivating factor* in the University's disciplinary decision[.]" *Doe II*, 1 F.4th at 830 (emphasis added).[13]

That standard is a different, and more flexible standard than the one used in Title VII reverse sex discrimination claims. The Title VII standard asks whether plaintiff has alleged "background circumstances" sufficient to support a finding that defendant is the unusual employer who discriminates against men, or whether plaintiff has alleged facts sufficient to raise a plausible inference that *but for* plaintiff's status as a man, the challenged decision would not have occurred. *Argo*, 452 F.3d at 1201. The court concludes that under the different and more flexible standard announced by the Tenth Circuit for claims of gender bias originating in a Title IX proceeding, plaintiff has alleged facts capable of supporting a plausible inference that sex was a motivating factor in ESU's disciplinary decision.

---

[13] The court rephrases the question from *Doe II*, a summary judgment case, to reflect the motion to dismiss standard applicable here.

The usual case allowing a Title IX claim to proceed past a motion to dismiss involves a male student alleging that a university reached an erroneous outcome against the substantial weight of evidence, paired with external pressure on the university to prosecute vigorously complaints of sexual harassment against men.  Indeed, every leading circuit court case at the motion to dismiss stage located by the court involved this same set of allegations.  *See, e.g.*, *Doe v. Columbia Univ.*, 831 F.3d 46, 56–57 (2d Cir. 2016); *Doe v. Univ. of Scis.*, 961 F.3d 203, 210 (3d Cir. 2020); *Doe v. Baum*, 903 F.3d 575, 586 (6th Cir. 2018); *Doe v. Purdue Univ.*, 928 F.3d 652, 669 (7th Cir. 2019); *Doe v. Univ. of Ark.-Fayetteville*, 974 F.3d 858, 865–66 (8th Cir. 2020).  The same goes for district courts in our Circuit.  *See, e.g.*, *Lee v. Univ. of N.M.*, 449 F. Supp. 3d 1071, 1145 (D.N.M. 2020); *Norris v. Univ. of Colo., Boulder*, 362 F. Supp. 3d 1001, 1012 (D. Colo. 2019).

But this is not the usual case, the court realizes.  Plaintiff's theory, as alleged in his Complaint, is that the faculty committee cleared him of misconduct in the J.J. case, but ESU sanctioned him anyway.  That is, the university placed certain restrictions on his interactions with students and told him that it would suspend him (pending investigation) if another student filed a harassment complaint.  A storm of media coverage about the investigation then followed the next semester.  This coverage included reporting about a student town hall with Garrett, where she discussed the case and sexual harassment generally and then, according to plaintiff's Complaint, "solicited individuals to come forward with complaints about [plaintiff.]"  Doc. 83 at 13 (Third Am. Compl. ¶ 84).  Another student then filed a harassment complaint and ESU put plaintiff on administrative leave.

Although there are no cases presenting similar facts to help guide the court—at least to the court and the parties' knowledge—the court concludes plaintiff's allegations suffice to raise

a plausible inference of gender bias.  This is a close call, but the allegation that ESU sanctioned plaintiff even though the faculty committee cleared him of misconduct is the critical allegation that nudges this claim across the 12(b)(6) line.  At least one court analyzing a Title IX claim on a motion to dismiss has concluded that a deviation from ordinary sanctions can support an inference of gender bias.

In *Doe v. University of Arkansas-Fayetteville*, 974 F.3d 858, 865 (8th Cir. 2020), *cited with approval in Doe II*, 1 F.4th at 831 (10th Cir. 2021), the university found plaintiff responsible for sexual assault by force but did not expel him (as was typical in those cases).  Instead, the university allowed the plaintiff to "graduate and required only Title IX training, community service, and an online course" due to the "extremely close factual determinations" the case required.  *Id.*  The plaintiff alleged that this "deviation from ordinary sanctions suggest[ed] that the University found him responsible for sexual assault in order to avoid further negative media attention and to portray a stricter approach to sexual assault cases."  *Id.*  The Eighth Circuit held that this allegation, paired with an outcome that was contrary to the substantial weight of evidence and external pressure on the school to find men responsible for sexual assault, sufficed to survive a motion to dismiss.  *Id.* at 865–66.

This case mirrors that one.  Here, the faculty committee determined plaintiff hadn't violated ESU's harassment policy.  But ESU sanctioned plaintiff anyway and put his employment on thin ice, because, in Garrett's view, this was a close case.  As Garrett explained to plaintiff:

> My obligation is to balance ESU's responsibility to protect students from predatory behaviors or behaviors that relate to academic dishonesty with the rights of a faculty member to be protected from false reports of such behaviors.  In a situation such as this where there are no direct witnesses and where both Complainant and Respondent have given compelling interviews regarding what

occurred, I find that although the Complainant's case has not been proven by clear and convicting evidence, the report does justify certain precautionary measures.

Therefore, it is my judg[]ment that certain steps should be taken to protect our students. These steps allow you to continue your employment at ESU, while providing reasonable protection for future students given that this case involves no witnesses and you have an otherwise unblemished record of more than two decades of employment as a faculty member.

Doc. 100-1 at 5 (Ex. B).

The most severe "precautionary measure" was plaintiff's automatic suspension should another student file a harassment complaint. And that is exactly what happened. Gender bias may not be the most plausible explanation for ESU putting plaintiff's employment on thin ice— but it is a plausible inference, especially in light of the campus controversy that followed and led (as plaintiff alleges) to a second harassment complaint producing his automatic suspension. And when that suspension did occur, Garrett "stepp[ed] outside of . . . standard protocols to share" the news with the university student body because of "significant community interest in th[e] matter[.]" Doc. 83 at 12 (Third Am. Compl. ¶ 80). It is plausible to infer that Garrett was responding to external pressure to hold plaintiff accountable for sexual harassment after the campus controversy surrounding the J.J. complaint.

Taking all of plaintiff's allegations together and drawing all inferences in his favor, the court concludes that plaintiff has done enough to survive a motion to dismiss this claim. In the end, plaintiff may not manage to muster sufficient evidence for his Title IX claim to proceed to trial. And even if he does, he may not persuade the factfinder that his inference is the most plausible one. The Tenth Circuit has made clear that "evidence of a school's anti-respondent bias" in a Title IX proceeding "does not permit a reasonable inference of an anti-male bias because both males and females can be respondents." *Doe I*, 952 F.3d at 1196; *see also Doe II*, 1 F.4th at 831 (noting that university bias "against sexual-misconduct respondents, regardless of

their sex" is legitimate and non-discriminatory "because respondent and complainant are (at least in the abstract) sex-neutral classifications"). But at this stage, plaintiff's Complaint alleges facts sufficient to raise a plausible inference of anti-male bias, and so the court will allow plaintiff's claim to proceed.

### C.    Other Federal Claims

Plaintiff raises two other federal claims and, once again, both rely on Title VII and Title IX—a claim for hostile work environment under Title VII and a claim for retaliation under Title IX. The court concludes that plaintiff has failed to allege facts to support either claim.

#### 1.    Title VII—Hostile Work Environment

"[A] plaintiff may establish a violation of Title VII by proving that discrimination based on sex . . . has created a hostile or abusive working environment." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66 (1986). To establish the existence of a hostile work environment, a plaintiff must allege facts raising a plausible inference "that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the [plaintiff's] employment and create an abusive working environment." *Sandoval v. City of Boulder*, 388 F.3d 1312, 1327 (10th Cir. 2004) (quoting *Davis v. U.S. Postal Serv.*, 142 F.3d 1334, 1341 (10th Cir. 1998)).

ESU doesn't make any specific arguments against this claim, other than its general argument for dismissal that plaintiff fails to allege any facts raising a plausible inference of discrimination. *See* Doc. 100 at 11–12. Plaintiff's response is equally general: that ESU subjected him to a "humiliating work experience for over a year." Doc. 113 at 9. Neither party provides any cases to guide the analysis of whether this particular claim should proceed. But

the court concludes that plaintiff hasn't alleged facts sufficient to establish a hostile work environment claim.

For one, as already concluded above, plaintiff hasn't alleged facts establishing that ESU treated him differently from other employees because he was a man. Necessarily then, he has not shown "that discrimination based on sex . . . has created a hostile or abusive working environment." *Meritor*, 477 U.S. at 66.

And plaintiff's alleged facts of a "humiliating work experience" don't raise a plausible inference that plaintiff's workplace at ESU was "permeated with discriminatory intimidation, ridicule, or insult." *Sandoval*, 388 F.3d at 1327. Plaintiff alleges that ESU punished him after the J.J. complaint concluded in his favor, "allowed" J.J. to violate her confidentiality agreement "without releasing him from the confidentiality agreement," suspended him from campus after another student filed a harassment complaint against him, and then, after he resigned, Garrett "told the media it was about women's rights." Doc. 113 at 9. Even accepting all these allegations as true, which the court must at this stage, they don't establish a plausible inference that ESU created a hostile work environment based on plaintiff's sex. Indeed, they don't say anything about ESU as a *workplace* at all. Rather, these allegations tell the story of the aftermath and fallout of a sexual harassment complaint on a college campus. That is not the usual circumstance for a Title VII hostile work environment claim. *See, e.g.*, *Hernandez v. Valley View Hosp. Ass'n*, 684 F.3d 950, 958 (10th Cir. 2012) (concluding plaintiff sufficiently established hostile work environment where her direct supervisor "repeatedly subjected her to racially insensitive and offensive comments and jokes" over a 14 month period); *Beck v. Figeac Aero N. Am., Inc.*, 382 F. Supp. 3d 1170, 1176 (D. Kan. 2019) (finding plaintiff sufficiently

alleged hostile work environment claim where plaintiff alleged multiple instances of employer's "disparaging remarks and . . . regular instances of . . . violent conduct").

Absent any authority suggesting a claim like plaintiff's claim should proceed—and plaintiff has cited none—the court concludes that plaintiff hasn't alleged a hostile work environment claim under Title VII.  The court thus dismisses that claim.

### 2.  Title IX—Retaliation

Plaintiff's Title IX retaliation claim requires the court to say a bit more.  For starters, Title IX's implied private cause of action for discrimination because of sex encompasses a claim for retaliation.  *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173–74 (2005).  When the Supreme Court recognized this idea in *Jackson*, it concluded that a recipient of federal funds violates Title IX when it "retaliates against a person *because* he complains of sex discrimination."  *Id.* at 174.  The Tenth Circuit has discussed Title IX retaliation claims in the same fashion.  *Doe v. Sch. Dist. No. 1, Denver, Colo.*, 970 F.3d 1300, 1310 (10th Cir. 2020) ("Retaliation against a person because that person has complained of sex discrimination is another form of intentional sex discrimination encompassed by Title IX's private cause of action." (quoting *Jackson*, 544 U.S. at 173)); *Hiatt v. Colo. Seminary*, 858 F.3d 1307, 1315 (10th Cir. 2017) ("Title IX also prohibits retaliation against individuals because they have complained of sex discrimination.").  This formulation also captures our court's recognition of Title IX retaliation claims.  *Douglass v. Garden City Cmty. Coll.*, No. CV 20-2076-KHV, 2021 WL 2352430, at *5, ___ F. Supp. 3d ___ (D. Kan. June 9, 2021) ("Title IX's enforcement scheme depends on individual reporting and accordingly protects from retaliation *individuals who witness and report discrimination*." (emphasis added)).

In his Complaint, plaintiff alleges that he "engaged in the protected activity of opposing sex discrimination by testifying, assisting and participating in the investigation of J.J.'s complaint" against him.  Doc. 83 at 19 (Third Am. Compl. ¶ 127).  In its Motion to Dismiss, ESU argues that plaintiff's mere participation in the proceedings against him doesn't count as opposition to sex discrimination as a matter of law, and so that participation can't provide the basis for a retaliation claim.  Doc. 100 at 13.  ESU is right.

Although the Tenth Circuit has not addressed this precise issue, other courts have.  So, the court looks to them for guidance and predicts the Tenth Circuit would find them persuasive if presented with this question.  For instance, the Eighth Circuit has held that "[n]o part of Title IX designates participation in a sexual harassment investigation on the side of the accused as protected activity."  *Du Bois v. Bd. of Regents of Univ. of Minn.*, 987 F.3d 1199, 1205 (8th Cir. 2021).  The Middle District of Tennessee has articulated persuasive reasoning for this conclusion:

> Doe has offered no authority for the novel proposition that defending himself against allegations of sexual misconduct, in and of itself, is the legal equivalent of opposing or complaining of unlawful practices under Title IX.  If this were the law, every respondent in a Title IX investigation would have a baked-in retaliation claim simply because they resisted an allegation of sexual misconduct.  Indeed, merely defending an allegation of misconduct is as different from actively opposing or complaining of unlawful discrimination as day is to night; the former involves affirming that one has not committed wrongdoing, while the latter rests on the notion, real or perceived, that one has been on the receiving end of or has opposed wrongdoing in the form of illegal discrimination.

*Doe v. Belmont Univ.*, 367 F. Supp. 3d 732, 757 (M.D. Tenn. 2019).

Unlike the plaintiff in that Tennessee case, plaintiff here has offered some authority for his position.  He relies on Title VI of the Civil Rights Act of 1964, which, the Supreme Court has recognized, served as the model for Title IX.  *Cannon v. Univ. of Chi.*, 441 U.S. 677, 694–95 (1979) ("Title IX was patterned after Title VI of the Civil Rights Act of 1964.").  Title VI

prohibits discrimination "on the ground of race, color, or national origin" in "any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. And one of its implementing regulations, 34 C.F.R. § 100.7(e), provides that "No recipient or other person shall intimidate, threaten, coerce, or discriminate against any individual . . . because he has . . . testified, assisted, *or participated in any manner in an investigation, proceeding, or hearing under this part*." 34 C.F.R. § 100.7(e) (emphasis added). Given the similarities between Title VI and Title IX, the Department of Education incorporated several Title VI regulations into Title IX, including § 100.7(e). *See* 34 C.F.R. § 106.71 (incorporating 34 C.F.R. § 100.7(e) into Title IX).[14]

Plaintiff argues that § 100.7(e)'s reference to "participat[ion] in any manner in an investigation, proceeding, or hearing under this part" allows plaintiffs in his position, *i.e.*, subjects of a Title IX proceeding, to bring a retaliation claim after the Title IX proceeding concludes. At least one court agrees with him, albeit with very limited analysis:

> The term "discrimination" is a term that covers a "wide range of intentional unequal treatment; by using such a broad term, Congress gave the statute a broad reach." A broad reading of the above regulation [§ 100.7(e)] protects the subject of a sexual harassment claim. Anything less would place too great a weight on false accusations by stripping the subject of the investigation of all protections from the very institution that is supposed to be an impartial tribunal.

---

[14] When plaintiff commenced this lawsuit, §106.71 merely incorporated § 100.7(e) by reference. *See* 34 C.F.R. § 106.71 (2019). But the Department of Education recently promulgated a final rule amending § 106.71 expressly to prohibit retaliation against "any individual" because that individual "participated or refused to participate in any manner in an investigation, proceeding, or hearing under this part." 34 C.F.R. § 106.71 (2020). And the notice of the final rule clarified that "§ 106.71 protects all parties (and witnesses, and other individuals) from retaliation for exercising rights under Title IX, and is not directed solely toward complainants." Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 85 Fed. Reg. 30026, 30278 (May 19, 2020). But the final rule took effect on August 14, 2020, after the conduct giving rise to this lawsuit. And it is well-established that agency rules have prospective effect, unless otherwise noted. *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988); *Nat. Res. Def. Council v. McCarthy*, 993 F.3d 1243, 1246 n.1 (10th Cir. 2021).

*Wilkerson v. Univ. of N. Tex.*, 223 F. Supp. 3d 592, 603 (E.D. Tex. 2016) (quoting *Jackson*, 544 U.S. at 175).

But the Eighth Circuit rejected the idea that § 100.7(e) allows subjects of Title IX investigations to bring Title IX retaliation claims merely because they participated in the proceedings against them.  It reasoned that the Supreme Court's decision in *Jackson* forecloses such a claim.  *Du Bois*, 987 F.3d at 1205 (citing *Jackson*, 544 U.S. at 178 & n.2).

In *Jackson*, the Supreme Court discussed its decision in *Alexander v. Sandoval*, 532 U.S. 275 (2001), which held that a plaintiff couldn't enforce certain Title VI regulations through the statute's private cause of action.  *Jackson*, 544 U.S. at 177 (discussing *Sandoval*, 532 U.S. at 285).  At issue in *Sandoval* were Department of Justice regulations prohibiting policies that had a discriminatory effect.  But Title VI only prohibits *intentional* acts of discrimination because of race, color, or national origin.  *Sandoval*, 532 U.S. at 280; *Jackson*, 544 U.S. at 177 (citing 42 U.S.C. § 2000d).  Because the regulations forbid conduct the statute allows (unintentionally discriminatory policies), the Court held that Title VI's private cause of action didn't include the right to enforce those regulations.  *Sandoval*, 532 U.S. at 285–86; *Jackson*, 544 U.S. at 178 ("*Sandoval* held that private parties may not invoke Title VI regulations to obtain redress for disparate-impact discrimination because Title VI itself prohibits only intentional discrimination.").  This holding didn't invalidate the regulations—it concluded merely that private parties couldn't enforce them.  *Sandoval*, 532 U.S. at 282.

Invoking *Sandoval*, the respondent in *Jackson* argued that § 100.7(e) couldn't expand Title IX's private cause of action to cover a retaliation claim because the statute didn't expressly prohibit retaliation.  But the Court rejected this argument, explaining that it wasn't impermissibly relying on the regulation to expand Title IX's private right of action beyond the

statute. *Jackson*, 544 U.S. at 178. Instead, the Court explained, "the statute *itself* contains the necessary prohibition" on retaliation. *Id*. The "text of Title IX prohibits a funding recipient from retaliating against a person who speaks out against sex discrimination, because such retaliation is intentional discrimination on the basis of sex." *Id.* (internal quotations omitted). Any focus on the regulation, the Court noted, "entirely misses the point." *Id.*

Neither the Supreme Court nor the Tenth Circuit has construed Title IX's implied private cause of action to allow a respondent in a Title IX proceeding to bring a retaliation claim simply for participating in the proceeding in his own defense. Even if one can read 34 C.F.R. § 100.7(e) to allow such a claim, the private cause of action is based on the "statute itself," which the Supreme Court has made clear focuses on "a person who speaks out against sex discrimination." *Jackson*, 544 U.S. at 178 (emphasis omitted). And this is how the Tenth Circuit understands the scope of a Title IX retaliation claim. *Doe v. Sch. Dist. No. 1*, 970 F.3d at 1310 ("Retaliation against a person because that person has complained of sex discrimination is another form of intentional sex discrimination encompassed by Title IX's private cause of action." (quoting *Jackson*, 544 U.S. at 173)); *Hiatt*, 858 F.3d at 1315 ("Title IX also prohibits retaliation against individuals because they have complained of sex discrimination.").

Applying this understanding, the court concludes that plaintiff fails to state a claim for retaliation under Title IX. Plaintiff's argument relies on his participation in the Title IX proceedings, not opposing discrimination. *See* Doc. 113 at 10–11 ("Here, Plaintiff defended himself. He participated in [ESU's] investigation of J.J.'s complaint, and he adhered with fidelity to [ESU's] confidentiality agreement as part of the investigation."). The scope of a Title IX retaliation claim—as discussed by the Supreme Court and the Tenth Circuit, and as addressed by persuasive authority on this exact issue from outside our Circuit—leads the court

to conclude that plaintiff fails to state a claim for Title IX retaliation as a matter of law.  The court thus dismisses that claim.

### D.      State Law Claims

In addition to his federal law claims, plaintiff also brings two state law claims, one for tortious interference with prospective contractual relationship or expectancy (Count IX) and one for Blacklisting under Kan. Stat. Ann. § 44-119 (Count X).  Doc. 83 at 23–24 (Third Am. Compl. ¶¶ 153–65).  Defendant ESU has moved to dismiss these claims as well.  As explained below, the court dismisses plaintiff's Blacklisting claim and denies plaintiff's related Motion to Certify Questions of Law to the Kansas Supreme Court (Doc. 125).  But the court allows plaintiff's tortious interference claim to proceed.  First, however, the court discusses its supplemental jurisdiction—its basis for subject matter jurisdiction over plaintiff's state law claims.

#### 1.  Supplemental Jurisdiction

The court has jurisdiction over plaintiff's federal claims under 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.").  A related provision, 28 U.S.C. § 1367(a), provides: "[I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."  *See also United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966) (holding that a district court has "[p]endent jurisdiction" over state law claims in a case if subject matter jurisdiction exists over the federal claim and the "state and federal claims . . . derive from a common nucleus of operative fact").  Here, the court

has dismissed some, but not all, of plaintiff's federal claims.  As discussed, his Title IX reverse

sex discrimination claim survives defendant's Motion to Dismiss.  And plaintiff's state law

claims revolve around the same set of operative facts as his federal claims:  the investigation

into complaints of sexual harassment against him and the eventual end of his employment with

ESU.  This means the court has supplemental jurisdiction over plaintiff's Kansas state law

claims under § 1367.

### 2.   Tortious Interference

To state a claim for tortious interference with prospective contractual relationship or

expectancy, a plaintiff must establish:

> (1) [T]he existence of a business relationship or expectancy with the probability
> of future economic benefit to the plaintiff; (2) knowledge of the relationship or
> expectancy by the defendant; (3) that, except for the conduct of the defendant,
> plaintiff was reasonably certain to have continued the relationship or realized the
> expectancy; (4) intentional misconduct by defendant; and (5) damages suffered by
> plaintiff as a direct or proximate cause of defendant's misconduct.

*Burcham v. Unison Bancorp, Inc.*, 77 P.3d 130, 151 (Kan. 2003) (quoting *Turner v. Halliburton

Co.*, 722 P.2d 1106, 1115 (Kan. 1986)).

Tortious interference is "'predicated on malicious conduct by the defendant.'"  *Id.*

(quoting *Turner*, 722 P.2d at 1115).  And "[m]alice is the intent to do harm without any

reasonable justification or excuse."  Kan. Civ. Pattern Jury Instructions § 103.05 (4th ed. 2012);

*Hysten v. Burlington N. Santa Fe Ry. Co.*, 530 F.3d 1260, 1276 (10th Cir. 2008) ("The term

'malice' is defined as 'a state of mind characterized by an intent to do a harmful act without a

reasonable justification or excuse.'" (quoting Kan. Civ. Pattern Jury Instructions § 103.05 (3d

ed. 2005))).

Plaintiff alleges that ESU interfered with his prospective employment at other

universities by informing representatives at those universities about the sexual harassment

complaints filed against him.  ESU's only argument against this claim is that plaintiff doesn't allege malice.  But "issues of defendants' motive and the presence or absence of malice are typically questions for the jury."  *Burcham*, 77 P.3d at 152 (reversing summary judgment against tortious interference claim because fact issues remained on defendants' motives).  At the very least, resolution of factual questions like malice are inappropriate at the motion to dismiss stage.  *See Cohen v. Battaglia*, 293 P.3d 752, 756 (Kan. 2013); *Seaboard Corp. v. Marsh Inc.*, 284 P.3d 314, 320 (Kan. 2012) ("[F]actual disputes cannot be resolved in ruling on a motion to dismiss[.]").  And here, plaintiff has alleged facts sufficient—if proved true—to establish a plausible inference of malice.

Plaintiff alleges he attempted to secure employment at three other universities in the spring of 2018 during the controversy on ESU's campus about the J.J. complaint.  Doc. 83 at 15 (Third Am. Compl. ¶ 100).  He alleges that all three universities declined to hire him after expressing interest in his application.  *Id.* at 15–16 (Third Am. Compl. ¶¶ 102–104).  And he alleges all three colleges made these decisions after the universities spoke with the administration at ESU.  *Id.*  Plaintiff applied to Park University in April 2018 (once he was already on administrative leave at ESU) and alleges a department chair told him the search committee felt a connection with him after a telephone interview, and that the provost would contact Cordle, the ESU Provost, to discuss plaintiff's application.  *Id.* at 15 (Third Am. Compl. ¶ 103).  But Park University didn't invite plaintiff to campus for an in-person interview, telling him that he was not a "viable candidate."  *Id.*  Plaintiff alleges "[i]t was clear . . . that Cordle had informed the Provost at Park about the sex harassment complaints against [plaintiff]."  *Id.*  In a similar chain of events, plaintiff also alleges he applied for a position at South Dakota State University and after a phone interview in May 2018, was informed in July that the university

did not select him for the position. *Id.* at 16 (Third Am. Compl. ¶ 104). Plaintiff alleges that the University said it would conduct an "off list reference check" about plaintiff and that "it was clear . . . that an ESU representative told the representative from South Dakota State about the J.J. complaint and the second complaint." *Id.* Were these plaintiff's only allegations, the court might conclude that they are "'merely consistent with'" liability for tortious interference and therefore "'stop[] short of the line between possibility and plausibility of entitlement to relief.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. 557) (further internal quotations omitted).

But those aren't plaintiff's only allegations. Plaintiff also alleges that early in 2018, before ESU suspended him, he applied for a position at Texas A&M University, and that A&M invited him to campus to interview. Doc. 83 at 15 (Third Am. Compl. ¶ 102). But, plaintiff alleges, on February 23, 2018, A&M rescinded the invitation because it "had recently learned that a university investigation of a student complaint found a 'preponderance of evidence' that [he was] in violation of university Title IX policies.'" *Id.* The court concludes this allegation, accepted as true and viewed in the light most favorable to plaintiff, establishes a plausible inference of malice. The timing of this allegation is crucial in nudging this claim over the line from possible to plausible: A&M rescinded the invitation *after* the ESU faculty committee cleared plaintiff of misconduct in the J.J. complaint, and *before* ESU told plaintiff about the second complaint and suspended him. So, plaintiff's allegation raises the plausible inference that ESU either misled A&M and didn't reveal that the J.J. proceedings were resolved in plaintiff's favor, or that ESU shared the existence of a second harassment complaint with A&M before it shared that information with plaintiff. Either inference plausibly alleges malice. So, the court allows plaintiff's tortious interference claim to proceed.

### 3.  Blacklisting

Plaintiff's final claim involves "blacklisting."  The relevant Kansas statute provides:

> Any employer of labor in this state, after having discharged any person from his service, shall not prevent or attempt to prevent by word, sign or writing of any kind whatsoever any such discharged employee from obtaining employment from any other person, company or corporation, except by furnishing in writing, on request, the cause of such discharge.

Kan. Stat. Ann. § 44-117.

Kansas law also provides a civil cause of action for blacklisting.  It provides:

> Any person, firm or corporation found guilty of the violation of this act, shall be liable to the party injured to an amount equal to three times the sum he may be injured, and such employers of labor shall also be liable for a reasonable attorney fee, which shall be taxed as part of the costs in the case.

Kan. Stat. Ann. § 44-119.

Plaintiff alleges ESU blacklisted him when it prevented him from securing employment with other universities.  Doc. 83 at 24 (Third Am. Compl., Count X).  ESU raises three arguments in its Motion to Dismiss:  *first*, that ESU did not discharge plaintiff; *second*, that the Complaint does not allege post-discharge conduct, as required by the statute; and *third*, that under the Tenth Circuit's interpretation of this blacklisting statute, a criminal conviction is required before a plaintiff may hold an employer civilly liable.  Doc. 100 at 16.  Plaintiff disputes all three of these arguments and moves this court to certify three questions of law to the Kansas Supreme Court.  *See* Doc. 125.[15]  But the court doesn't need to do that, nor does the

---

[15] These questions arise from plaintiff's response to ESU's arguments:

1.  Whether the Defendant University discharged the Plaintiff within the meaning of Kan. Stat. Ann. § 44-117.
2.  Assuming there was a discharge, whether only post-discharge conduct of the employer may be considered to determine liability within the meaning of Kan. Stat. Ann. § 44-117.
3.  Whether a criminal conviction is required as an element of a Blacklisting claim within the meaning of Kan. Stat. Ann. § 44-119.

court have to consider ESU's first two arguments, because ESU's third argument—that a criminal conviction is required before a plaintiff may maintain a civil suit for blacklisting under § 44-119—is dispositive.

In *Anderson v. United Telephone Co. of Kansas*, 933 F.2d 1500, 1503 (10th Cir. 1991), the Tenth Circuit considered the statutory language of § 44-119, especially the use of the words "guilty" and "liable."  The Tenth Circuit "construe[d] these terms in an ordinary way to mean criminal guilt and civil liability."  *Id.*  Thus, the Tenth Circuit concluded, an employer "shall 'be liable' only when it has been 'found guilty' of criminal blacklisting" and so "a criminal blacklisting conviction is an element of a civil blacklisting claim against an employer under Kansas law."  *Id.*  Because plaintiff hasn't alleged ESU was criminally convicted of blacklisting, plaintiff cannot maintain a civil suit under § 44-119.

But plaintiff argues that *Anderson* is no longer good law.  He relies on a decision from the Harvey County District Court in Kansas that departs from *Anderson*'s holding and concludes that a criminal conviction is not required before a private plaintiff may hold an employer civilly liable for blacklisting.  *See Rowland v. U.S.A. 800, Inc.*, No. 14-CV-12 (Kan. Dist. Ct. Feb. 17, 2015).  But plaintiff doesn't provide any authority from the Kansas Supreme Court interpreting § 44-119, because, as *Rowland* itself acknowledges, there is none.  *Id.*  In the absence of any authority from the Kansas Supreme Court, this court is bound by the holding of the Tenth Circuit in *Anderson* that a criminal conviction is required before a plaintiff can bring a civil action for blacklisting.  *Kokins v. Teleflex, Inc.*, 621 F.3d 1290, 1295 (10th Cir. 2010) ("'[W]hen a panel of [the Tenth Circuit] has rendered a decision interpreting state law, that interpretation is binding on district courts in this circuit, *and* on subsequent panels of [the Tenth

---

Doc. 125 at 2 (Pl.'s Mot. to Certify Questions of Law to Kan. Sup. Ct.).

Circuit], unless an intervening decision of *the state's highest court* has resolved the issue.'" (quoting *Wankier v. Crown Equip. Corp.*, 353 F.3d 862, 866 (10th Cir. 2003)) (second emphasis added)).  So, plaintiff fails to state a claim for Blacklisting.  The court thus dismisses that claim.

This conclusion leaves plaintiff's related Motion to Certify Questions of Law to the Kansas Supreme Court on the Blacklisting issues he raises.  "Certification may be appropriate 'where the legal question at issue is novel and the applicable state law is unsettled[.]'" *Pehle v. Farm Bureau Life Ins. Co.*, 397 F.3d 897, 900 n.1 (10th Cir. 2005) (quoting *Allstate Ins. Co. v. Brown*, 920 F.2d 664, 667 (10th Cir. 1990)).  But even in that circumstance, certification is "never compelled."  *Id.*  That's because the decision "to certify a question of state law to the state supreme court is within the discretion of the federal court." *Armijo v. Ex Cam, Inc.*, 843 F.2d 406, 407 (10th Cir. 1988).  So, as here, where the legal question at issue is not novel and the Tenth Circuit plainly has addressed the issue, the court exercises its discretion to deny plaintiff's Motion to Certify Questions of Law to the Kansas Supreme Court.

## IV.    Conclusion

The court dismisses plaintiff's § 1983 claims (Counts VII and VIII) against the individual defendants (David Cordle, Allison Garrett, Ray Lauber, Max McCoy, and Lisa Moritz).  Because those were the only claims asserted against those defendants, the court dismisses them from this suit.  The court also dismisses the following claims against Emporia State University:

- Title VII Reverse Sex Discrimination (Count I)

- Title VII Hostile Work Environment (Count IV)

- Title IX Retaliation (Count V)

- Blacklisting (Count X)

But the court does not dismiss the following claims against Emporia State University:

- Title IX Reverse Sex Discrimination/Gender Bias (Count II)[16]

- Tortious Interference with Prospective Contractual Relationship or Expectancy (Count IX)

So, those claims will proceed.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant David Cordle's Motion to Dismiss (Doc. 89) is granted;

**IT IS FURTHER ORDERED THAT** defendant Allison Garrett's Motion to Dismiss (Doc. 91) is granted;

**IT IS FURTHER ORDERED THAT** defendant Ray Lauber's Motion to Dismiss (Doc. 93) is granted;

**IT IS FURTHER ORDERED THAT** defendant Max McCoy's Motion to Dismiss (Doc. 95) is granted;

**IT IS FURTHER ORDERED THAT** defendant Lisa Moritz's Motion to Dismiss (Doc. 97) is granted;

**IT IS FURTHER ORDERED THAT** defendant Emporia State University's Motion to Dismiss (Doc. 99) is granted in part and denied in part, as set forth in full in this Order;

**AND, IT IS FURTHER ORDERED THAT** plaintiff's Motion to Certify Questions of Law to the Kansas Supreme Court (Doc. 125) is denied.

**IT IS SO ORDERED.**

---

[16] Again, the court only allows this claim to proceed to the extent it is premised on gender bias flowing from the Title IX proceeding and resulting discipline. *See supra* pp. 28–29, 35–39.

Dated this 21st day of September, 2021, at Kansas City, Kansas.

s/ Daniel D. Crabtree
Daniel D. Crabtree
United States District Judge